**21 WEST LANCASTER CORP.**

**v.**

**MAIN LINE RESTAURANT, INC., William Plaginos, Maria Plaginos, the United States Internal Revenue Service, and the Commonwealth of Pennsylvania Department of Revenue.**

**Civ. A. No. 84–2005.**

United States District Court,
E.D. Pennsylvania.

July 10, 1985.

Ronald N. Rutenberg, Philadelphia, Pa., for 21 West Lancaster Corp.

Edward S.G. Dennis, Jr., U.S. Atty., Rachel Shao, Asst. U.S. Atty., Philadelphia, Pa., Hunt, U.S. Dept. of Justice, Washington, D.C., for U.S. of America and Internal Revenue Service.

David S. Fishbone, Michael Kaliner, Philadelphia, Pa., for William and Maria Plaginos.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court is a motion for summary judgment filed by defendants William and Maris Plaginos ("Plaginos"), and a motion for summary judgment filed by defendant United States Internal Revenue Service (the "government"). Briefly stated, the moving parties here call upon the court to resolve the validity and priority of an assignment of a Pennsylvania liquor license to the Plaginos and of a subsequently filed federal tax lien on that liquor license. For the reasons stated herein, the motion of the government will be denied, and the motion of the Plaginos will be granted.

## FACTS

The parties have stipulated to all of the material facts.

On June 5, 1980, Main Line Restaurants, Inc. ("Main Line") borrowed $60,000.00 from Jaybee Loan Company ("Jaybee"). Main Line gave Jaybee a security interest in all of its restaurant equipment, including Restaurant Liquor License No. R–12993. Subsequently, financial statements were timely filed covering the equipment, including the liquor license, with the Recorder of Deeds of Montgomery County, the Prothonotary of Montgomery County, and the Secretary of the Commonwealth of Pennsylvania. Presumably Jaybee also took possession of the liquor license.

On April 13, 1981, April 20, 1981, and August 3, 1981, the Commissioner of the Internal Revenue Service (the "Commissioner") assessed against, gave notice to, and demanded payment from Main Line for unpaid trust fund federal employment taxes and interest for the third and fourth quarters of 1980 and the first quarter of 1981. On July 20, 1981, the Commissioner assessed against, gave notice to, and demanded payment from Main Line for unpaid federal unemployment taxes and interest for 1981. These assessments remain unsatisfied, and additional amounts have accrued since the date of notice and demand. The government filed notices of a federal tax lien under the Internal Revenue Code with the Prothonotary of Montgomery County on July 15, 1981, September 1, 1981, and June 22, 1983.[1]

During the month of May, 1981,[2] Main Line and 21 West Lancaster Corp. ("21

---

**1.** Paragraphs 14 and 15 of the stipulation of facts refer the court to the unpaid balance of assessments allegedly referred to in paragraph 12 of the stipulation of facts. Paragraph 12, however, merely asserted that the Plaginos filed Form UCC 3 financing statements with the Recorder of Deeds of Montgomery County, the Prothonotary of Montgomery County, and the Secretary of the Commonwealth of Pennsylvania. Nothing in paragraph 12, as far as the court can determine, refers to unpaid assessments. Nonetheless, the court must presume, for purposes of this analysis, that the parties intended that paragraphs 14 and 15 of the stipulation reference paragraph 13. Paragraph 13

614 F.Supp.—7

refers the court to assessments made by the Commissioner of the Internal Revenue Service against Main Line for unpaid trust fund employment taxes and interest for the third and fourth quarters of 1980 and the first quarter of 1981 and for unpaid federal unemployment taxes and interest for the year 1981.

**2.** In May, 1983, two transactions occurred. In one, Main Line and 21 West Lancaster Corp. signed an agreement to transfer the liquor license to 21 West. In the other, Jaybee assigned its title and interest in the liquor license to the Plaginos. The parties do not stipulate, however,

West") signed an agreement of sale ("May agreement") which purported to transfer the assets of Main Line's liquor and restaurant business to 21 West. In this May agreement Main Line agreed to sell the liquor license to 21 West in accordance with the rules and regulations of the Pennsylvania Liquor Control Board (the "board").

On May 23, 1983, Jaybee assigned its title and interest in the liquor license to the Plaginos.[3] The appropriate financing statements were timely filed with the Recorder of Deeds of Montgomery County, the Prothonotary of Montgomery County, and the Secretary of the Commonwealth of Pennsylvania. Presumably the Plaginos also took possession of the liquor license.

On June 23, 1983, the May agreement was revised by supplemental agreement ("June agreement") between Main Line, the Plaginos, and 21 West. In the June agreement Main Line agreed to transfer the liquor license directly to 21 West for a consideration of $60,000.00,[4] and the Plaginos agreed to sell the other liquor and restaurant assets of Main Line, excluding those for which the May agreement directed an inventory to be taken,[5] to 21 West for a consideration of $115,000.00. Payment of the consideration for the liquor license and the $115,000.00 inventory was to be made directly to the Plaginos.

On August 17, 1983, the government served notice on 21 West seeking all property of Main Line which was in 21 West's possession, plus statutory additions. This amount totaled $60,359.58. On June 18, 1984, 21 West, pursuant to a court Order, deposited the sum of $62,283.12 with the Registry of the Court which represents the sum of $60,000.00 plus interest thereon from December 20, 1983. From this fund, 21 West was awarded costs of $30.50.

The Plaginos and the government are now before the court claiming the interest in the fund. The parties stipulate that no funds have been turned over to the government.

Main Line, 21 West, and the Commonwealth of Pennsylvania disclaim all further interest in the fund.

The Plaginos argue: (1) the government's execution on a Pennsylvania liquor license is wrongful because the federal statute permits the government to levy upon property only as defined by state law and a liquor license is not property under Pennsylvania law; (2) execution on the liquor license by the government is wrongful because the execution would impair the Plaginos' property interest in the license; and (3) execution on the liquor license by the government is wrongful because the execution would impair the Plaginos' property interest.

The government argues on the contrary that: (1) the Plaginos acquired no property right directly in or collateral to the liquor license; and (2) the Internal Revenue Code authorizes the Commissioner to lien and levy upon property, including a Pennsylvania liquor license.

DISCUSSION

At the heart of this case is the validity of the government's claim and the Plaginos' claim. Determination of the validity of the

the order of these transactions. The court presumes, for purposes of the statement of facts, that the assignment occurred after the May agreement and prompted a supplemental agreement.

3. The court notes that Maria Plaginos signed the May agreement, the June 30th agreement, and the loan agreements, which were made part of the record, on behalf of Main Line as President of Main Line, and William Plaginos signed the loan agreements as an officer of Main Line. The parties' stipulation of facts, however, does not specify the corporate relationship between Main Line and the Plaginos.

4. The parties do not specify whether Main Line had the power to transfer the liquor license in light of the 1980 assignment to Jaybee and the May 23rd assignment to the Plaginos. The court presumes, however, that the parties intended that Main Line would have the power at the appropriate time to perform its obligation under the June agreement.

5. The inventory was not included in the record created by the parties.

claims involves a two-prong analysis. *In re Halprin*, 280 F.2d 407 (3d Cir.1960). The first prong is merely an examination of the "incidences" of a Pennsylvania liquor license under Pennsylvania law. The second prong is "whether an interest thus created and defined falls within the 'property or rights to property' category" under the federal statute or the "property" category under the Uniform Commercial Code ("UCC"), which authorizes federal and UCC liens on property.

## A. *Validity of Private Creditor's Claim*

With respect to the Plaginos' claim, the court turns to the first prong of the analysis. A summary of the relevant principles of the Pennsylvania Liquor Code, 47 Pa. Cons.Stat.Ann. 1–101, *et seq.* (Purdon 1984) (the "Code"), is appropriate here.

■■■ The Code creates the Pennsylvania Liquor Control Board, Code § 2–201, and authorizes the board to issue retail liquor licenses for premises kept or operated by a restaurant. Code § 4–401(a). A liquor license is a privilege. It does not constitute property in the hands of the licensee. Code § 4–468(b.1); *1412 Spruce v. Pennsylvania Liquor Control Board*, 504 Pa. 394, 474 A.2d 280 (1984). A restaurant liquor license entitles the restaurateur to purchase liquor from Pennsylvania liquor stores and sell, on the restaurant premises, liquor to patrons.

The Code bars the restaurateur from assigning or transferring a restaurant liquor license directly to another person. Code § 4–468(a). The Code, however, permits the board to transfer a license issued by it from one person to another "upon payment of the transfer filing fee and the execution of a new bond." Code § 4–468(a). The board has the exclusive power to fix the time of transfer of liquor licenses "except

in cases of emergency such as death, serious illness, or [certain] circumstances beyond the control of the licensee." *Id.* In the case of death of a licensee, the board may transfer the license to the surviving spouse or personal representative or a person designated by him. *Id.*

■■■ It is well settled in Pennsylvania that a liquor license cannot be subject to the execution process, *1412 Spruce, supra,* nor can it be subject to a valid security interest. *In re Revocation of Liquor License No. R–2193,* 456 A.2d 709 (Pa. Commw.Ct.1983). The rationale underlying this rule is that the "Uniform Commercial Code—Secured Transactions," 13 Pa. Cons.Stat.Ann. § 9101, *et seq.* (Purdon 1984), which provides for the attachment and enforceability of security interests, permits only attachment and enforcement of security interests upon collateral. 13 Pa.Cons.Stat.Ann. § 9203. Collateral is defined as "[t]he property subject to a security interest...." 13 Pa.Cons.Stat.Ann. § 9105(a). Since, under the Code, a liquor license is expressly not property, a liquor license cannot be collateral under the UCC. It cannot be attached nor can a lien upon it be enforced under the UCC by a private creditor.[6]

■■■ Although a liquor license is not assignable, the license does enhance the value of the licensee's business. A liquor license is not without value. Due process requires the state to pay the licensee just compensation for the liquor license in the context of condemnation proceedings. *Redevelopment Authority of Philadelphia v. Lieberman,* 461 Pa. 208, 338 A.2d 249 (1975). Also, after the licensee's death the statutory right to apply for transfer of the liquor license is includable in decedent's estate for Pennsylvania inheritance tax purposes, even though the value of a liquor

---

6. The Plaginos claim that, in spite of the Pennsylvania Supreme Court's *1412 Spruce* decision, their interest in the liquor license was perfected. In effect, the Plaginos argue that the *1412 Spruce* decision should not be applied retrospectively. The Pennsylvania Supreme Court, however, created no new law in *1412 Spruce;* the

court merely construed a Pennsylvania statute enacted in 1978. None of the relevant transactions in the present case occurred prior to the enactment of the statute. Thus, in brief, the Plaginos' retrospectivity argument is without merit.

license is not includable in the decedent's estate. *See In re Feitz Estate*, 402 Pa. 437, 167 A.2d 504 (1961). Therefore the court concludes that although the Code bars assignment of the license, it does not bar assignment of the value enhancement component of the license. *See Branding Iron, Inc. v. Business Loans, Inc.*, 7 B.R. 729 (Bankr.E.D.Pa.1980). The "assignee" cannot transfer or assign the license nor can he initiate execution proceedings. The "assignee" can, however, claim a prior right to the proceeds in the event that the liquor license is transferred by the board. *Id.*

■ In the present case, Main Line intended to assign and did assign its interest in the liquor license to Jaybee, which in turn intended to and did assign its interest to the Plaginos. Since, at the time of the assignments, the only interest in the assignor was the liquor licensee's value enhancement component, only this component was assigned to Jaybee and, subsequently, to the Plaginos.

### B. *Validity of the Government's Claim*

Following *Halprin's* two-prong analysis, the court turns to the first prong and incorporates by reference here the discussion above of the "incidences" of a Pennsylvania liquor license under Pennsylvania law. Additionally, the court notes that the government does not contend that it has the power or authority to transfer the liquor license, absent approval by the board. Under the Code, only the board can transfer the liquor license. Code § 4–468. In fact, the government's brief seems to con-

cede that, prior to the transfer of liquor licenses collected by the government, the board must have the opportunity to review and approve the location descriptions and plans of the transferee's business.

The court turns now to the government's rights in the liquor license, the second prong of the *Halprin* analysis.

The Internal Revenue Code provides for a lien on "all property and rights to property" of a delinquent taxpayer, 26 U.S.C. § 6321,[7] and authorizes the Secretary of the Treasury to levy on "all property or rights to property" belonging to a delinquent taxpayer or on which there is a lien. 26 U.S.C. § 6331.[8]

The government argues in the present case that a Pennsylvania liquor license should be characterized as "property or rights to property" under the Internal Revenue Code, and, thus, that the government has a lien upon and can execute upon the liquor license.

In order to resolve this question, the court must first determine whether, as a matter of statutory construction, the characterization of "property or rights to property" as used in 26 U.S.C. §§ 6321 and 6331, is a question of state law or federal law. The Plaginos argue that interpretation of the term property or rights to property is the question of state law, and, since Pennsylvania law characterizes a Pennsylvania liquor license as a privilege and not as property, 26 U.S.C. §§ 6321 and 6331 do not authorize the government to lien or execute on a Pennsylvania liquor license. The government, arguing the contrary position, asserts that interpretation of a federal statute is a federal question, and that

---

**7.** Title 26 of U.S.C. § 6321 provides:

If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person.

**8.** Title 26 U.S.C. § 6331(a) provides in pertinent part:

(a) Authority of Secretary or delegate.—If any person liable to pay any tax neglects or refuses to pay the same within ten days after notice and demand, it shall be lawful for the Secretary or his delegate to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax.

characterization of a Pennsylvania liquor license, therefore, is a federal question.

The Supreme Court in *Morgan v. Commissioner*, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940), considered an analogous question. The Court held that a power of appointment characterized by Wisconsin state law as a special power of appointment could be classified and taxed under the federal estate tax as a general power of appointment.

> State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed. Our duty is to ascertain the meaning of the words used to specify the thing taxed. If it is found in a given case that an interest or right created by local law was the object intended to be taxed, the federal law must prevail no matter what name is given to the interest or right by state law.

309 U.S. at 80–81, 60 S.Ct. at 426. At the time *Morgan* was decided, Congress had not defined in the Internal Revenue Code a general power of appointment. As a result, the *Morgan* Court looked elsewhere. Citing "Sugden on Powers (8th Ed.) p. 394 [and] Farwell on Powers (2d Ed.) p. 7," the Court applied "the distinction usually made between a general and a special power" and did not apply Wisconsin law. The Court also found Congressional intent to adopt the "usual distinction" into federal estate tax laws because Congress had reenacted the gross estate inclusion section without tampering with an outstanding Treasury regulation, which had set forth the "usual distinction."

In *Halprin, supra*, the Third Circuit Court of Appeals applied an analysis similar to that of the *Morgan* Court. The *Halprin* court recognized that, while creation of legal interests is a state law question, construction of a federal statute is a federal question. The circuit court said:

> Under the terms of Section 6321 of the Internal Revenue Code of 1954 a duly perfected lien of the United States for taxes attaches to "all property and rights to property, whether real or personal, belonging to" a delinquent taxpayer. Application of this statute involves a two-step inquiry in which both state and federal law must be consulted. State law creates legal interests and defines their incidents, but the ultimate question whether an interest thus created and defined falls within a category stated by a federal statute requires an interpretation of that statute, which is a federal question. *Morgan v. Commissioner*, 1940, 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585; *Fidelity & Deposit Co. of Md. v. New York City Housing Authority*, 2 Cir., 1957, 241 F.2d 142.

280 F.2d at 409. The circuit court, assuming that the purported legal interest was valid under state law, proceeded to determine whether it was property or rights to property under 26 U.S.C. § 6321. The appropriate analysis of this second prong of the inquiry, the *Halprin* court indicated, was as follows:

> Our federal problem is whether, in a wholly executory bilateral contract, valid under state law, a promise to pay for goods or services which are yet to be delivered or performed is property of the promisee within the meaning of this lien-creating statute. We must apply what relevant data we can find, including our understanding of the nature and characteristics of contract rights and property rights at common law, in order to decide what kinds of intangible rights Congress covered in the phrase "property and rights to property," as it is used in Section 6321.

280 F.2d at 409. In applying the "relevant data," the third circuit did not confine its consideration to the legal principles in Pennsylvania. Instead, the circuit court reviewed and applied the legal precepts of the laws of several states.

In summary, the court concludes that Supreme Court and third circuit precedent directs that interpretation of the phrase "property or rights to property," set forth in 26 U.S.C. §§ 6321 and 6331, be a federal question.

The Supreme Court has also directed the lower courts to interpret broadly the phrase "property or rights to property." *Glass City Bank v. United States*, 326 U.S. 265, 267, 66 S.Ct. 108, 110, 90 L.Ed. 56 (1945); *see Citizens Bank of Barstow v. Vidal*, 114 F.2d 380, 382-83 (10th Cir. 1940). For purposes of this opinion, the court adopts the broadest possible meaning of the phrase "property or rights to property" from the introductory note of the Restatement of the Law of Property:

> The word "property" is used in this Restatement to denote legal relations between persons with respect to a thing. The thing may be an object having physical existence or it may be any kind of an intangible such as a patent right or a choose in action. The broader meanings of the word "property," which include any relationship having an exchange value, are not used.

Restatement of the Law of Property, Introductory Note, p. 3-4 (1936).

No matter how broadly the term "property or rights to property" is construed under federal law, it cannot, however, be construed to authorize the government to lien or execute upon property in which the taxpayer has no interest. *Pittsburgh National Bank v. United States*, 657 F.2d 36 (3d Cir.1981); *In re Halprin*, 280 F.2d 407 (3d Cir.1960).

■ In the present case, Main Line assigned the value enhancement component of the liquor license to Jaybee in 1980. Thus, when the government's statutory lien on Main Line's interest in the liquor license subsequently arose, Main Line's interest in the value enhancement component was limited by the extent to which Jaybee or the Plaginos had a prior right to that component.

The government cites numerous cases for the proposition that a liquor license is property upon which the government can lien and execute.[9] Those cases, however, do not stand for the proposition that the government has a right to the license. Those cases merely indicate that the government may obtain a statutory right to the proceeds arising from the sale of the liquor license.

## CONCLUSION

Accordingly, the court holds that the Plaginos have a right to the proceeds from the sale of the liquor license senior to that of the government.

An appropriate Order will be entered.

## ORDER

AND NOW, TO WIT, this 10th day of July, 1985, for the reasons stated in the accompanying Memorandum, IT IS ORDERED as follows:

1. The motion for summary judgment filed by defendant Plaginos is *granted;*

2. The motion for summary judgment by defendant United States Internal Revenue Service is *denied;*

3. The Registry of the Court is *directed* to turn over the $60,000.00 fund plus accrued interest to defendants William and Maria Plaginos.

---

9. *Bogus v. American National Bank of Cheyenne, Wyoming*, 401 F.2d 458 (10th Cir.1968); *Paramount Finance Company v. United States*, 379 F.2d 543 (6th Cir.1967); *Commonwealth of Kentucky v. United States*, 77–1 USTC 86, 766 (W.D. Ky.1977); *Lewis City v. City of Grand Rapids, Michigan*, 222 F.Supp. 349, 384 (W.D.Mich. 1963); *Midwest Beverage Co. v. Gates*, 61 F.Supp. 688 (W.D.Ind.1945); *The Boss Co., Inc. v. Board of Commissioners of Atlantic City*, 192 A.2d 584 (Sup.Ct.N.J.1963); *Deitsch v. Board of Liquor License Commissioners for Baltimore City*, 1 AFTR2d 1680 (Baltimore City Court 1958). Additionally, after the parties had filed their briefs in this case the United States District Court for the Eastern District of Pennsylvania characterized the federal lien as a lien upon the liquor license. *JFWIRS, Ltd. v. United States*, 607 F.Supp. 566 (M.D.Pa.1985). Nonetheless, in the final analysis, all of these cases recognized that the government had a right only to the proceeds arising from the sale of the license and not a right in the license itself.